RANDOLPH G. BACHRACH
ATTORNEY AT LAW
7303 W. BOSTON STREET
CHANDLER, ARIZONA 85226
480-753-4474
FAX: 602-707-7512
SBN 12621
rgbphx@badfaithlaw.us

Kevin Koelbel, SBN 016599
Kyle J. Shelton, SBN 027379
LAW OFFICES OF KEVIN KOELBEL, P.C.
7303 W. Boston Street
Chandler, AZ 85226
(480) 705-7550
(480) 705-7503 Fax
kevin@koelbellaw.com
kyle@koelbellaw.com
Attorney for Plaintiff

THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Deana Tuttle,<br>         Plaintiff,<br>v.<br>Varian Medical Systems, Inc. Medical Plan Administrator, United Healthcare Insurance Company,<br>         Defendants. | Case No. CV 2012-01424 GMS<br><br>**PLAINTIFF' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56 and LRCiv 56.1, Deana Tuttle ("Tuttle") submits the following facts in support of her Motion for Summary Judgment:

1. Tuttle was employed full-time by Varian Medical Systems, Inc. ("Varian") as a Medical Physicist. Dkt.No.1 ¶ 8.

2. Tuttle is a participant in Varian's Welfare Benefit Plan (the "Plan"), which is a health and medical reimbursement insurance plan. *Id.* ¶ 4; Dkt.No.15 ¶4.

3. Varian is the Plan Sponsor and Defendant United Healthcare Insurance Company ("UHIC") is the insurer of the Plan, as well as the claims administrator. Dkt.No.1 ¶¶ 5–6; Dkt.No.15 ¶¶ 5–6.

4. UHIC issued a policy to Varian and its employees. Dkt.No.22-1 [Admin. Record] at 124; Dkt.No.35 at 4.

5. Tuttle has no training (formal, or otherwise) in either the law or insurance contracts. Exhibit A ¶5.

6. Tuttle has been covered under the Varian medical plan ("Plan") continuously since she commenced employment. Exhibit A ¶6.

7. During 2009, the Plan was insured by UHIC. *Id.* ¶7.

8. Prior to 2009, Varian provided to Tuttle several documents describing her coverage and benefits under the Plan. *Id.* ¶8.

9. She was provided a 2009 "U.S. Benefits Guide" ("Guide"). Exhibit A ¶9; Exhibit B.

10. She was also provided a 2007 "Benefits Handbook ("Handbook"). Exhibit A ¶10; Exhibit C.

11. Prior to the denial of the medical claims which are the subject of her lawsuit, the Plan Administrators never provided her with a copy of the Group Policy issued to her employer (Varian) or a Certificate of Coverage (including, any amendments). Exhibit A ¶11.

12. When she received the Plan's Guide and Handbook she reviewed them carefully in order to understand the benefits she was entitled to receive. *Id.* ¶14.

13. In July 2009, Tuttle was diagnosed with breast cancer (T2, N1, MO, grade 2 invasive ductal carcinoma of the left breast, estrogen and progesterone receptor positive, HER-2/neu overexpression negative) by the Mayo Clinic (Scottsdale, AZ). Dkt.No.1 ¶ 13; Dkt.No.15 ¶13; Exhibit A ¶15.

14. Because she had previously (prior to 2009) received care and treatment at the Mayo Clinic (Scottsdale) she preferred to be treated for her cancer at Mayo Clinic. Exhibit A ¶16.

15. Because Mayo Clinic was at the time an out-of-network hospital on the Plan she reviewed her Plan documents again to be certain as to her financial responsibility for treatment of her breast cancer at Mayo. *Id.* ¶17.

16. After carefully reading the terms and conditions of the Guide and the Handbook she understood that she would be liable for 20% of the "usual and customary" or "usual and prevailing" rates as defined by the Plan. *Id.* ¶18; Exhibit B at 28; Exhibit C at 12.

17. She understood from the Handbook and Guide that Mayo's charges would not be fully paid and that she would be responsible for amounts above the prevailing rate in the "geographic area" determined at the "80th percentile" of similar charges of similar providers, in the area. Exhibit A ¶19; Exhibit B at 4; Exhibit C at 52.

18. She also understood that her maximum "out-of-pocket" liability was capped at $5,000 (annually). Exhibit A ¶20; Exhibit B at 28; Exhibit C at 52.

19. The section of the Policy entitled "ERISA Statement" is a Summary Plan Description ("SPD"). Dkt.No.35 at 6-7; Dkt.No.22-1 at 167-168.

20. The SPD does not define or explain what constitutes "out-of-network" benefits. Dkt.No.22-1 at 167-168.

21. The SPD does not define or explain what constitutes the limit of "out-of-pocket" expenses. *Id.*

22. The SPD states, "Method of calculating the amount of contribution: Employee-required contributions to the Plan Sponsor are the employee's share of costs as determined by the Plan Sponsor. From time to time, the Plan Sponsor will determine the required employee contributions for reimbursement to the Plan Sponsor and distribute a schedule of such required contributions to employees." *Id.* at 168.

23. The Policy states, under "Schedule of Benefits," that, "You can choose to receive Network Benefits or Non-Network Benefits." Dkt.No.22-1 at 30.

24. The Policy states, "Non-Network Benefits apply to Covered Health Services that are provided by a non-Network Physician or other non-Network provider, or Covered Health Services that are provided at a non-Network facility." *Id.*

25. Under the Policy, the annual deductible for "Non-Network" benefits is $500 per Covered Person, not to exceed $1,000 for all Covered Persons in a family. *Id.* at 32.

26. Under the Policy, the "Out-of-Pocket Maximum" a participant would pay per year for "Non-Network" benefits is $5,000 per Covered Person, not to exceed $10,000 for all Covered Persons in a family. *Id.* at 32-33.

27. The "Out-of-Pocket Maximum" includes the Annual Deductible. *Id.* at 33.

28. Once a participant reaches the "Out-of-Pocket Maximum," benefits are payable at 100% of Eligible Expenses during the rest of that year. *Id.* at 32-33.

29. The Policy states, "The Out-of-Pocket Maximum does not include any of the following and, once the Out-of-Pocket Maximum has been reached, you still will be required to pay the following:

- Any charges for non-Covered Health Services.
- The amount Benefits are reduced if you do not notify us as required.
- Charges that exceed Eligible Expenses.
- Copayments or Coinsurance for any Covered Health Service identified in the Schedule of Benefits that does not apply to the Out-of-Pocket Maximum.
- Copayments or Coinsurance for Covered Health Services provided under the Outpatient Prescription Drug Rider."

*Id.* at 33.

30. The Maximum Policy Benefit is the maximum amount the policy will pay for benefits during the entire period of time the participant is enrolled under the Policy. *Id.* at 33.

31. The Maximum Policy Benefit for Network and Non-Network Benefits is $2,000,000 per Covered Person. *Id.* at 33.

-4-

32. The Policy pays 80% of Non-Network physician fees for surgical and medical services. *Id.* at 41.

33. The Policy pays 80% of Non-Network physician's office services for sickness and injury services. *Id.* at 41-42.

34. The Policy states, "For Non-Network Benefits, you are responsible for paying, directly to the non-Network provider, any difference between the amount the provider bills you and the amount we will pay for Eligible Expenses. Eligible Expenses are determined solely in accordance with our reimbursement policy guidelines, as described in the Certificate of Coverage." *Id.* at 50.

35. The Policy states, "For Non-Network Benefits, Eligible Expenses are based on either of the following:

> When Covered Health Services are received from a non-Network provider, Eligible Expenses are determined, **at our discretion**, based on the lesser of:
> - Fee(s) that are negotiated with the provider,
> - 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market,
> - 50% of the billed charge, or
> - a fee schedule that we develop.

*Id.* at 50-51 (emphasis added).

36. The explanation for the denial of her claims states:

> A NONNETWORK HEALTH CARE PROVIDER OR FACILITY PROVIDED THESE SERVICES. YOUR CLAIM HAS BEEN PAID ON YOUR BENEFIT PLAN, WHICH USES BENCHMARKS ESTABLISHED BY THE FEDERAL GOVERNMENT, INCLUDING RATED AND METHODOLOGIES USED BY THE MEDICARE PROGRAM.

Exhibit D. Note this explanation does not match the explanation in the denial letters [Dkt.No.22-1 at 212, 241 and 333] or the Policy [Dkt.No. 22-1 at 50-51].

37. On November 13, 2009, when denying Tuttle's appeal of the covered amount, UHIC's Appeal Coordinator represented:

> [W]hen covered health services are received from non-network providers, eligible expenses are determined based on the following applicable criteria, to the extent available, **in the order of priority** identified below:
>
> - Fee(s) that are negotiated with the provider,
> - 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market,
> - a fee schedule that we develop, or
> - 50% of the billed charge.

Dkt.No. 22-1 at 212 (emphasis added). Note that the lack of discretion and the changed ordered from the policy.

38. On January 12, 2010, when denying Tuttle's appeal of the covered amount, UHIC's Appeal Coordinator represented:

> [W]hen covered health services are received from non-network providers, eligible expenses are determined based on the following applicable criteria, to the extent available, **in the order of priority** identified below:
>
> - Fee(s) that are negotiated with the provider,
> - 110% of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for Medicare for the same or similar service within the geographic market,
> - a fee schedule that we develop, or
> - 50% of the billed charge.

Dkt.No. 22-1 at 241 (emphasis added); *id.* 333. Note that the lack of discretion and the change in order from the policy.

39. The Policy states in "Our Responsibilities" that, "In accordance with any state prompt pay requirements, we will pay Benefits after we receive your request for payment that includes all required information." *Id.* at 58.

40. On August 4, 2009 and August 12, 2009, Tuttle underwent multiple breast cancer surgical procedures at the Mayo Clinic (Scottsdale, AZ). Dkt.No.1 [Complaint] ¶14; Dkt.No.15 [Answer] ¶14; Exhibit A ¶21.

41. The Mayo Clinic in Scottsdale, Arizona is a nonnetwork provider for the Plan. Dkt.No.15 ¶ 26; Exhibit A ¶17.

42. On August 19, 2009, the Mayo Clinic post-surgery notes state:

> Ms. Tuttle is a 51-year-old female who had a suspicious mammogram done in early July which showed an abnormality of the left breast at 3 o'clock position. Ultrasound showed a 2-cm mass. Biopsy 07/07/09 was positive for invasive ductal carcinoma Nottingham grade 2, ER/PR positive, HER-2/neu negative. There was lymphovascular invasion. She underwent a lumpectoher and sentinel lymph node sampling 08/04/09. She was found to have a 2.2 cm tumor with two positive sentinel lymph nodes. There was extensive lymphovascular involvement. The margins of resection were negative. She underwent a completion axillary dissection and additional lymph nodes were negative on 08/12/09. She had a total of 2 of 11 nodes positive. Her margin was re-excised on 08/13/09 and there was no evidence of residual disease.
>
> Postoperatively, she is having some difficulty in raising her arm to a 90-degree angle. She has got pain that is 8 to 9 out of 10 in intensity, which is somewhat relieved with Tylenol. She does not want to take pain medications. She saw Dr. Karlin today who recommended chemotherapy as well as adjuvant hormonal therapy. She is here to discuss radiation.

Dkt.No.1 ¶ 15; Dkt.No.15 ¶ 15.

43. The Plan was notified in advance that Tuttle would receive surgery for her breast cancer at the Mayo Clinic (Scottsdale, AZ), with their "Resolving Analyst" admitting that, "I researched our call records and determined we were given notification these services would be performed." Dkt.No.22-1 at 241; Dkt.No.1 ¶ 25; Exhibit A ¶33.

44. The Mayo Clinic submitted bills to the Plan for payment of medical expenses related to Plaintiff's treatment for date of service of August 4, 2009 through August 12, 2009. Dkt.No.15 ¶ 28.

45. The Plan paid approximately twenty (20%) percent of Tuttle's breast cancer expenses incurred at the Mayo Clinic. Exhibit A ¶¶22-24.

46. The Plan denied additional coverage. Dkt.No.22-1 at 211-214.

47. Tuttle has fully exhausted all administrative remedies required under the Plan. Dkt.No.1 ¶ 44; Dkt.No.15 ¶44.

48. Mayo billed approximately $50,000 for Tuttle's cancer surgeries and treatment. Exhibit A ¶22.

49. Tuttle was shocked and dismayed when she later learned that the Plan would only pay approximately $10,000 of the Mayo charges. *Id.* ¶23.

50. If she had known prior to her decision to have cancer surgery and treatment at Mayo that the Plan actually intended to pay only about 20% of the bills (which is the percentage she expected to pay) she would not have gone to Mayo for her care. *Id.* ¶24.

51. She relied entirely on the terms of the Plan described and set forth in the Plan documents provided to her in making the decision to have her cancer treated at Mayo. *Id.* ¶25.

52. If the Plan documents provided to Tuttle prior to her surgery and treatment at Mayo included any of the information which she learned about for the first time when her claims were processed and paid she would have chosen, albeit reluctantly, an in-network medical facility for her cancer care and treatment. *Id.* ¶26.

53. Prior to the processing of her Mayo treatment bills in late 2009, she was never made aware by the Plan Administrators of any provision in the Plan that allowed the Plan to arbitrarily pay any amount to her out-of-network medical providers that it chose to pay (*i.e.*, "[a] fee schedule that [the Plan Administrators] develop"). *Id.* ¶27.

54. Prior to the processing of her Mayo treatment bills in late 2009, she was never made aware by the Plan Administrators of any provision in the Plan that allowed the Plan to limit payment of her out-of-network bills to the amount contracted by the Federal government with Medicare providers (*i.e.*, "110% of the available published rates allowed by Medicare for the same or similar service within the geographic market"). *Id.* ¶28.

55. Because she was unaware of these undisclosed Plan provisions relating to payment of out-of-network medical bills (*i.e.*, either Medicare rates, or, any "fee schedule" developed by the Plan Administrators) she relied entirely upon the written information provided to her by the Plan (the Guide and the Handbook) to inform her decision to seek treatment of her breast cancer at Mayo Clinic. *Id.* ¶29.

56. If either the Plan's Guide or the Handbook had explained that payment of her out-of-network medical bills could be limited to either Medicare rates or, indeed, any other amount the Plan arbitrarily chose to pay (as she was later advised), she absolutely would not have chosen to receive cancer treatment at Mayo Clinic. *Id.* ¶30.

57. Prior to deciding to have her breast cancer treated at Mayo Clinic, she reasonably expected that her Mayo bills would be paid at or very close to 80% of the billed amounts after taking into consideration the "80th percentile" of the "usual and prevailing rates" for the same services in her geographic area, according to the written terms, conditions and definitions provided to her by the Plan. *Id.* ¶31.

58. Prior to deciding to have her breast cancer treated at Mayo Clinic, she contacted representatives of the Plan to confirm that she had coverage for treatment of her breast cancer at Mayo, which was confirmed without any mention of the undisclosed Plan terms (above) with respect to payment of out-of-network charges. *Id.* ¶32.

59. Prior to deciding to have her breast cancer treated at Mayo Clinic, Mayo Clinic billing representatives contacted representatives of the Plan to confirm that she had coverage for treatment of her breast cancer at Mayo, which was confirmed without any mention of the undisclosed Plan terms (above) with respect to payment of out-of-network charges. *Id.* ¶33.

60. When she voluntarily opted to receive her medical health coverage from her employer she did not and never intended to bargain for her out-of-network bills to be paid at any arbitrary amount chosen by the Plan (including, a Medicare rate which effectively reversed the responsibility for payment of her medical bills from 80% by the Plan to 80% by the employee). *Id.* ¶34.

61. When she was told that her cancer bills at Mayo Clinic would only be paid at the rate of about 20% she was shocked and felt betrayed by the Plan Administrators of her medical plan because this is completely contrary to everything she had previously been told and led to believe about her Plan's out-of-network benefits. *Id.* ¶35.

Dated this 24th day of March 2014,

                                            LAW OFFICES OF KEVIN KOELBEL, P.C

                                      By:  s/Kevin Koelbel
                                                Kevin Koelbel
                                                Attorney for Plaintiff